IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

MARCUS DEWAYNE WILLIAMS #2191711 §

VS. § CIVIL ACTION NO. 6:22cv359

BRYAN COLLIER, et al. §

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRTE JUDGE

  Plaintiff Marcus Dewayne Williams, an inmate of the Texas Department of Criminal Justice (TDCJ), *pro se*, filed this complaint under 28 U.S.C. § 1983 complaining of alleged violations of his constitutional rights in prison. The lawsuit was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

  Defendants Collier, Townsend, and Pace were dismissed from this case by previous Order. (Dkt. #20.) Now before the Court is the motion by Defendants Aucker and Defoor for summary judgment on the merits of Petitioner's claims. (Dkt. #24.) Plaintiff has had ample opportunity to respond to the motion, which he did not do, and it is ripe for review. For the reasons explained below, the undersigned recommends that the motion be granted, and that Defendants be granted summary judgment on the merits of Plaintiff's amended complaint.

**I. Plaintiff's Claims**

  Plaintiff alleges in his sworn complaint that he began seeking medical attention for ear pain in April 2021 and, despite several requests, his complaints were "totally neglected until 10-11-21 when the discharge, extreme irritation, lack of sleep, and headaches caused by [his] ear gradually

got wors[e]." (Dkt. #1 at 4.) He says he saw Defendant Nurse Practitioner Ofili on October 11, 2021. (*Id.*) She "assumed" he had an ear infection and prescribed an antibiotic for him. (*Id.*) At a follow-up two weeks later, he informed Ofili that the medication had not been effective. (*Id.*) Several weeks after that, he saw Defendant Nurse Manager Aucker, who examined his ear, observed that it was very red and irritated, and prescribed another round of the same antibiotic Ofili had prescribed, even though Plaintiff told her that it had been ineffective. (*Id.*)

On December 8, 2021, Plaintiff sought medical attention again due to lack of sleep caused by the pain in his ear. (Dkt. #1 at 4.) He was seen on December 20 by Defendant Nurse Defoor. (*Id.* at 5.) She told him she did not "see anything" in his ear and sent him back to his cell. (*Id.*) But two days later, Defoor told a correctional sergeant that Plaintiff had an outside medical appointment scheduled for December 28 because his ear "didn't look good." (*Id.*) For reasons unknown to Plaintiff, he was not taken to his December 28 appointment. (*Id.*) Instead, he was taken back to the prison medical clinic and saw Defendant Aucker again, who examined his ear and told him that he "had holes in [his] eardrum." (*Id.*) He was returned to his cell with another outside appointment scheduled for February 4, 2022, but he was not transported to that appointment either. (*Id.*)

Plaintiff was finally seen on March 15, 2022, and was diagnosed with Temporal Mandibular Joint Tenderness and prescribed a special diet. (*Id.*) He alleges that "[d]ue to the deliberate indifference I was told on 7-15-22, that I lost hearing in my ear and most likely have to be confined to an [sic] hearing a[i]d for the rest of my life." (*Id.*)

Plaintiff seeks compensatory and punitive damages totaling $2 million. (Dkt. #1 at 4.)

**II. Defendants' Motion and Evidence**

Defendants first assert that Plaintiff's claims for damages against them in their official capacities are barred by Eleventh Amendment immunity and that this Court lacks jurisdiction over those claims. (Dkt. #24 at 6–7.) They state that they are employed by the University of Texas Medical Branch (UTMB), which is an agency of the State of Texas. (*Id.* at 7.) Accordingly, suits against their official capacities are effectively suits against the State of Texas, which is immune from suit. (*Id.* at 6–7.)

Next, Defendants assert that the relevant evidence leaves no genuine dispute from which a factfinder could conclude that they were deliberately indifferent to Plaintiff's serious medical needs. (Dkt. #24 at 7–15.) To support their position on the facts, Defendants rely on the Plaintiff's medical records (Dkt. #25) and the affidavit of Dr. Glenda M. Adams, a medical doctor licensed by the Texas Medical Board and employed by the UTMB, which highlights and explains the material facts within those records. (Dkt. #25-1.) Dr. Adams reviewed Plaintiff's medical records and relevant grievances for the purpose of giving testimony in this case, and she summarizes the relevant facts from those records as follows:

Timeline of Events related to Mr. Williams' Ear Complaints

| | |
|---|---|
| 04/20/2021 to 08/09/2021 - | On April 20, 2021, the Michael Unit medical department receives a Sick Call Request (SCR) from Mr. Williams dated April 18, 2021, in which he complains of something in his ear that has been there for weeks. The SCR is screened and determined not to be urgent or emergent. Due to the on-going COVID-19 pandemic, prisoner movement is limited to prevent/reduce coronavirus spread. Mr. [Williams] is informed that he may be seen by a nurse for follow-up if needed. [FN10: See Exhibit 4 – Sick Call Request date stamped April 20, 2021.] The same day he is seen by a nurse for Covid-19 vaccination, but he refuses the vaccine. [FN11: See Exhibit 4 – Refusal of Treatment form for COVID-19 vaccine dated April 20, 2021.] |
| | On May 18, Mr. Williams is seen in the medical department and refuses tetanus vaccination. On June 8 he refuses hepatitis laboratory work. There is no medical record documentation that he offered any complaints about his ear or |

3

any other medical issues at these visits. Nor are there any Sick Call Requests received from Mr. Williams after April 20 concerning his ears until June 10, 2022. [FN12: See Exhibit 4 – Refusal of Treatment forms for May 18 and June 8, 2021.]

On June 10, the medical department receives a Sick Call Request from Mr. Williams in which he states, 'I have something in my ear that's causing my head to hurt.' Mr. Williams is scheduled for Nursing Sick Call (NSC). [FN13: See Exhibit 4 – Sick Call Request date stamped June 10, 2021.]

On June 24, Mr. Williams is seen by nursing staff for examination after a security Use of Force. He offers no complaints other than left shoulder pain. There is no visible injury to the shoulder. However, he is seen in the UTMB Orthopedic Clinic for his shoulder pain on August 9, 2021. The Orthopedic Clinic diagnoses arthritis and tendonitis. [FN14: See Exhibit 4 – Use of Force Clinic Note for June 24, 2021, and Orthopedic Clinic Note and Return from Medical Appointment Note for August 9, 2021.]

The medical record does not contain any Sick Call Requests or verbal complaints from Mr. Williams about his ears after June 10 until September 27, 2021.

| | |
|---|---|
| 09/27/2021 to 10/06/2021 - | On September 27, Mr. Williams is seen cell side during nursing rounds by Registered Nurse (RN) Maria Defoor. Mr. Williams wants his right ear examined because he believes 'something may have crawled in it.' However, there are no available security escorts and RN Defoor is limited in the exam she is able to perform cell side. RN Defoor documents 'I could not assess [the] inner ear at cell side, I did not note any drainage, edema (swelling), or erythema (redness) to [the] right ear. He is not expressing any pain at this time.' RN Defoor refers Mr. Williams to be seen by a medical provider (physician, physician assistant, or nurse practitioner) for a more extensive examination of his right ear. [FN15: See Exhibit  - Nursing Clinic Note dated September 27, 2021.] [Of note is that Mr. Williams is in restrictive housing (administrative segregation) and requires security escort whenever he is out of his cell. Nursing staff make rounds *at least* once daily on prisoners in restrictive housing.]<br><br>Mr. Williams is scheduled to see Nurse Practitioner (NP) Rosemary Ofili on September 30 and October 6, but each appointment must be rescheduled because no security staff are available to escort Mr. Williams to the medical department. [FN16: See Exhibit 5 – Clinic Notes dated September 30 and October 6, 2021.] |
| 10/11/2021 - | On October 11, NP Ofili sees Mr. Williams for his complaint of right ear pain and drainage. On examination, Mr. Williams has mild bilateral ear was but no erythema (redness), exudate, or drainage. NP Ofili empirically [FN17: Empirical antibiotic therapy is treatment that is based upon knowledge of the |

4

|  |  |
|---|---|
|  | most likely organism causing an infection or suspected infection.] prescribes Mr. Williams a trial of the antibiotic Amoxicillin 500 mg twice daily for 10 days and the pain medication acetaminophen/Tylenol 650 mg twice daily for 30 days. NP Ofili orders a follow-up appointment in two weeks with a plan to refer Mr. Williams to a specialist if his ear pain is not resolved. [FN18: See Exhibit 5 – Clinic Note and Prescription Report dated October 11, 2021.] |
| 10/25/2021 - | NP Ofili sees Mr. Williams for follow-up on his ear complaints. He now complains of bilateral ear pain. Examination of both ears is normal with no wax or exudate seen in either ear. NP Ofili renews Mr. Williams' prescription for the pain medication acetaminophen/Tylenol and submits a referral to the UTMB ENT (ear, nose, and throat) Clinic for ear pain that Mr. Williams reports has been present for 4 weeks. [FN19: See Exhibit 5 – Clinic Note and Referral Request dated October 25, 2021.] |
|  | After October 25, Mr. Williams offers no further complaints about his ears until November 17, 2021. |
| 11/17/2021 - | On November 17, Mr. Williams presents to the medical department as a 'walk-in' and requests that his right ear be examined because it has been 'really hurting' for 'at least a week.' Mr. Williams is seen by RN Garrett Smith via the Nursing Protocol for Eye/Ear/Nose/Throat Complaints. Mr. Williams complains of intermittent right ear pain that is sharp, throbbing, and non-radiating. On examination, Mr. Williams' left ear is completely normal. The right ear externally is also normal, but the canal is slightly red and contains cerumen. The tympanic membranes (eardrums) are intact bilaterally. Specifically, there is no evidence of a foreign body, trauma, discharge, or apparent hearing loss. RN Smith contacts NP Ofili who empirically orders Mr. Williams the antibiotic Amoxicillin 500 mg twice daily for 10 days. [FN20: See Exhibit 5 – Nursing Protocol for Eye/Ear/Nose/Throat Complaints; Prescription Report for November 17, 2021.] |
| 12/10/2021 to 12/16/2021 - | On December 10, the medical department receives a Sick Call Request from Mr. Williams dated December 8 in which he seeks to have his ears checked for a possible infection. [FN21: See Exhibit 5 – Sick Call Request date stamped December 10, 2021.] |
|  | On December 15, Mr. Williams has an appointment to see NP Ofili for a sick Call Request in which he asks for a pork-free diet. There are no security escorts to bring Mr. Williams to the medical department, so NP Ofili administratively grants Mr. Williams' request by adding 'pork/porcine product derivatives' to Mr. Williams' allergy list. [Information on food allergies and special diets are transmitted electronically to TDCJ food services.] The same day, RN Maria Defoor sees Mr. Williams cell side. Mr. Williams states that he is still having problems with his ears and believes the problem is something *other* than an infection. RN Defoor notes that Mr. Williams completed antibiotic therapy for |

5

|  |  |
|---|---|
|  | his ears on November 27, 2021. Mr. Williams denies current ear pain. RN Defoor cannot examine Mr. Williams' middle or inner ears while he is in his cell but notes that his outer ear has no drainage, edema (swelling), or erythema (redness). He exhibits no shortness of breath (SOB), no cough, and no congestion. RN Defoor refers Mr. Williams to have his ears examined in the clinic by a medical provider. [FN22: See Exhibit 5 – Clinic Note and Nursing Clinic Note dated December 15, 2021.] |
|  | On December 16, Mr. Williams refuses his hepatitis B medications. [FN23: See Exhibit 5 – Refusal of Treatment form dated December 16, 2021.] |
| 12/20/2021 - | Security brings Mr. Williams to the medical department after he sets a fire in his cell. Mr. Williams screams at staff and kicks a trash can, the nursing desk, and exam table. He is very argumentative and states that he set the fire because he is in pain. RN Defoor notes that Mr. Williams exhibits no visual signs typical of pain (e.g. no grimacing). Nursing staff are unable to obtain Mr. Williams vital signs due to his aggressive behavior. The medical record documents that 'staff felt unsafe.' Mr. Williams exhibits no shortness of breath (SOB). He allows RN Defoor to perform an examination. There is <u>no</u> redness, edema, or drainage of either ear. His tympanic membranes are intact. RN DeFoor consults with NP Ofili who notes that Mr. Williams has a UTMB ENT/Otolaryngology Clinic appointment scheduled for December 28, 2021. NP Ofili orders Mr. Williams the pain medication ibuprofen/Motrin 800 mg to take twice daily for 30 days with two refills. [FN24: See Exhibit 5 – Nursing Clinic Note, Provider Clinic Note, and Prescription Report dated December 20, 2021.] |
| 12/28/2021 - | For unknown and undocumented reasons in the medical record, Mr. Williams is not seen in the UTMB ENT/Otolaryngology Clinic on December 28, 2021. However, there are no Sick Call Requests or documented complaints to nursing staff of ear problems after December 20, 2021, prior to Mr. Williams being seen in the UTMB ENT Clinic on March 15, 2022. |
| 02/02/2022 - | There is no documentation in Mr. Williams' medical record for February 4, 2022, about his UTMB ENT/Otolaryngology Clinic appointment. However, the response to his Step 1 Grievance #2022047606 indicates that the appointment was cancelled and rescheduled due to inclement weather. [FN25: See Mr. Williams *Complaint* and attached Step 1 Grievance #2022047606.] The Texas Division of Emergency Management confirms, 'Below-freezing temperatures and ice accumulation caused travel impacts for much of Texas between **February 1 and February 6, 2022**.' The event was named winter storm Landon. [FN26: See Exhibit 6 – Information on February 2022 Winter Storm Landon.] |
| 03/15/2022 - | On March 15, 2022, Mr. Williams is seen in the UTMB ENT/Otolaryngology Clinic in Galveston, Texas. He complains of *right* ear pain *and* hearing loss. He also reports allergies, 'scratchy' throat, and globus (sensation that |

6

something is stuck in one's throat). The otolaryngologist notes Mr. Williams' history of hepatitis B and a 30 pack-year smoking history. [FN27: Pack-years is a measure of the amount a person has smoked over time. It is calculated by multiplying the number of packs of cigarettes smoked per day by the number of years the person has smoked. One pack-year is equivalent to smoking 20 cigarettes a day for one year or two packs (40 cigarettes) a day for six months, etc.] On examination, Mr. Williams *right* ear has a normal ear canal and tympanic membrane (eardrum) with no fluid (i.e. drainage or discharge). The left ear also has a normal ear canal and tympanic membrane with no fluid. However, examination of the left ear reveals a 'Left duplicate EAC (external auditory canal)/preauricular pit without e/o (evidence of) infection.' [FN28: See Exhibit 8- Duplicate EAC and preauricular pit are congenital ear anomalies.] Examination further shows 'Severe right TMJ (temporomandibular joint) [FN29: The TMJ is a sliding hinge join[t] on either side of the head that connects the jawbone to the skull.] tenderness and crepitus [FN30: Crepitus is a grating sound or sensation produced by friction between bone and cartilage.] with subluxation' [FN31: Subluxation of a joint is a partial dislocation.] and a 'left tonsillith.' [FN2: A tonsilith or tonsil stone is a small hard lump that forms in the tonsil from debris and bacteria. Most tonsilliths are asymptomatic but can include low grade sore throat and/or chronic bad breath.] Mr. Williams was diagnosed with 1) right facial pain/myofascial pain [FN33: Facial myofascial pain is caused by muscle tension, fatigue, or spasm in the masticatory muscles. The pain is usually the result of bruxism and may be associated with TMJ dysfunction. Bruxism is a condition in which one grinds, gnashes, or clenches their teeth. Bruxism may occur during sleep or unconsciously while awake.], 2) gastroesophageal reflux disease (GERD), 3) allergic rhinitis, 4) globus sensation, 5) right ear pain, and 6) chronic tonsillitis. He is prescribed Nasacort and loratadine/Claritin for his allergies and encouraged to take the ibuprofen/Motrin he has previously been prescribed twice daily for his ear and TMJ pain. He is also provided information on TMJ management and advised on a soft diet and to avoid chewing bum and hard nuts during TMJ symptom flare ups. Finally, Mr. Williams is scheduled a follow-up appointment with the ENT/Otolaryngology Clinic with an audiogram to be completed prior to the appointment [FN34: See Exhibit 6 – UTMB Otolaryngology Clinic Note dated March 15, 2022 and Return from Medical Appointment notes dated March 16, 2022.]

Mr. Williams returns to the Michael Unit on March 16, 2022. [FN35: See Exhibit 6 – Return from Medical Appointment notes dated March 16, 2022.]

04/06/2022 - On April 6, the medical department receives a Sick Call Request (SCR) from Mr. Williams dated April 4, 2022. Mr. Williams states, 'I went to Galveston on 3-15-22 and was not properly examined or properly treated. I was told that I would be rescheduled, I was taken off my pain medication, and I have been having real bad headaches, irritation real bad, and the same problem since the first time I put in a medical request last year (4-18-21). I just would like to get

|  |  |
|---|---|
|  | properly treated because I know something is seriously wrong with my ear. Please help!!' Mr. Williams is scheduled for Nursing Sick Call (NSC). [FN36: See Exhibit 6 – Sick Call Request date stamped April 6, 2022.] [Of note is that the UTMB ENT/Otolaryngology Clinic did not take Mr. Williams off his pain medication but rather encouraged him to take the prescribed pain medication (ibuprofen/Motrin twice daily (BID). [FN37: See Exhibit 6 – UTMB Otolaryngology Clinic Note dated March 15, 2022.]] |
| 04/08/2022 to 04/14/2022 - | On April 8, Mr. Williams is seen in Chronic Care Clinic by Nurse Practitioner (NP) Francisca Okuma for his chronic hepatitis B. He complains that his right ear continues to feel irritated and hurts. NP Okuma orders Mr. Williams prescriptions for the allergy medication loratadine/Claritin and the combination antibiotic/steroid drops (neomycin/polymyxin/hydrocortisone solution) for his ears an asks clerical staff to check on the date of his UTMB ENT/Otolaryngology Clinic follow-up appointment. NP Okuma is informed that Mr. Williams has an appointment scheduled for the specialty clinic on April 15, 2022. [FN38: See Exhibit 6 – Chronic Care Clinic Note dated April 8, 2022, and email from Correctional Clinical Associate (CCA) Little to NP Okuma showing that Mr. Williams has a HG ENT appointment scheduled for April 15, 2022.]

On April 14, Mr. Williams refuses his otolaryngology (ENT) appointment. [FN39: See Exhibit 6 – Refusal of Treatment form dated April 14, 2022.] |
| 05/24/2022 to 05/26/2022 - | On May 24, the medical department receives a Sick Call Request (SCR) dated May 22 from Mr. Williams in which he complains that he still has not been treated for his TMJ pain and he is again having ear irritation, ear discharge, and headaches. He further complaints that 1) NP Ofili prescribed him ibuprofen for his ear pain knowing that the medication is dangerous to his health due to his chronic hepatitis B liver disease [FN40: Patients with hepatitis B but *without advanced liver disease* can safely take ibuprofen/Motrin and acetaminophen/Tylenol. Ibuprofen is contraindicated if there is concomitant kidney disease. Tylenol should be limited to doses of 2000 mg or less over a 24-hour period. Both drugs should be used in the lowest effective dose and only as needed for effective pain relief.] and 2) NP Okuma prescribed him ear drops that are ineffective. Mr. Williams 'would like to be properly treated.' RN Maria Defoor screens Mr. Williams' SCR and requests clerical staff to schedule him for Provider Sick Call (PSC). [FN41: See Exhibit 6 – Sick Call Request date stamped May 24, 2022.]

On May 26, Mr. Williams misses his Provider Sick Call appointment because he is away from the Michael Unit for Physical Therapy Clinic. NP Francisca Okuma orders that Mr. Williams be rescheduled for PSC. [FN42: See Exhibit 6 – Chart Review and Physical Therapy Note dated May 26, 2022.] |

| | |
|---|---|
| 05/27/2022 and 05/28/2022 | On May 27 at 23:18 (11:18 PM) after a security Use of Force, nursing staff are informed that Mr. Williams was found 'hanging in his cell.' RN Maria Defoor collects Mr. Williams and transports him on a backboard and stretcher to the medical department. He has no ligature marks on his neck but has multiple bruises to his right ear, face and head and is exhibiting uncontrolled tremors. He is alert and oriented x4 (person, place, time, and situation) with regular heart rate and rhythm (HRR) and no shortness of breath (SOB). RN Defoor calls 911 for a transfer to the Palestine Regional Medical Center (PRMC) emergency room. RN Defoor then notifies the Michael Unit on call medical provider, UTMB/CMC Utilization Review (UR), and the PRMC emergency room that the transfer is in progress. Mr. Williams departs the Michael Unit via community EMS (emergency medical services) at midnight (24:00). [FN43: See Exhibit 6 – Urgent/Emergent Care Note dated May 28, 2022.]<br><br>Mr. Williams is discharged from the PRMC emergency room on May 28 at 02:30 (2:30 AM) after CT scans of his face, head, and neck reveal no fractures or other serious injuries. Mr. Williams' discharge diagnosis is 'Facial Contusions.' [FN44: See Exhibit 6 – Palestine Regional Medical Center (PRMC) Emergency Department records for May 28, 2022.] |
| 07/15/2022 - | Mr. Williams undergoes audiometric testing prior to his follow-up UTMB ENT/Otolaryngology Clinic visit. He provides the audiology technician a history of right ear pain for over a year followed by the development of intermittent tinnitus (ringing in the ear) and hearing loss. He reports that he has been unable to take the pain medication (ibuprofen/Motrin) prescribed for his TMJ pain. Mr. Williams denies a history of otalgia [FN45: Otalgia is pain in or about the external ear or temporal bone. The most common cause of otalgia is infection.], otorrhea [FN46: Otorrhea is drainage from the ear.], and recent ear infections. He also denies a history of noise exposure. On physical exam, both of Mr. Williams' ears exhibit normal canals and tympanic membranes. On audiometric testing, Mr. Williams' *voluntary* results show severe to profound hearing loss in the right ear and moderately severe hearing loss in the left ear. However, pure tone Stenger [FN47: The Stenger test is based on the auditory phenomenon "The Stenger Principle" and is used when a patient is 'suspected of possible malingering a hearing loss.' Available at www.interacoustics.com/audiometers/ac40/support/stenger-test.] and other testing indicate inconsistent results and 'non-organic hearing loss.' [FN48: See Exhibit 7 – Audiology Report dated July 15, 2022, and excerpts from articles on Nonorganic Hearing Loss. Nonorganic hearing loss is decreased hearing unexplained by anatomic and/or physiologic abnormalities. The term is synonymous with functional hearing loss and pseudohypacusis. The patient *may or may not* have an actual medical condition associated with the hearing loss.]<br><br>After completing audiometric testing, Mr. Williams is seen in the ENT/Otolaryngology Clinic. Mr. Williams reports hearing loss since |

> November and jaw pain for several months. He continues to complain of throat discomfort which he describes as 'scratching sensation of globus.' On examination, Mr. Williams' *right* ear has an anatomically normal canal and tympanic membrane (eardrum) with no fluid (i.e. drainage or discharge), but there is a slight flaking of the skin of the external auditory canal. The left ear also has a normal ear canal and tympanic membrane with no fluid but the presence of a 'Left duplicate EAC (external auditory canal)/preauricular pit without e/o (evidence of) infection' is again noted. The remainder of Mr. Williams' physical exam is unchanged from his initial examination on March 15, 2022. After review of Mr. Williams' hearing test, the otolaryngologists determine that the audiogram is 'unreliable' and will need to be repeated. Mr. Williams is diagnosed with 1) otorrhea [FN49: Otorrhea is liquid drainage from the ear canal.] of his right ear, 2) chronic bilateral eczematous otitis externa [FN50: Eczematous otitis externa is inflammation or irritation of the skin of the external ear canal. Signs and symptoms include skin flaking with or without itching, redness, drainage, etc. depending upon severity of the condition.], 3) TMJ (temporomandibular joint) disorder, and 4) hearing loss of the right ear, unspecified type. Mr. Williams is prescribed antibiotic/steroid ear drops for his right ear and again advised to take ibuprofen/Motrin twice daily for his ear and jaw pain. A repeat future audiogram is planned. [FN51: See Exhibit 7 – UTMB Otolaryngology Clinic Note dated July 15, 2022.]
>
> Mr. Williams returns to the Michael Unit on July 16, 2022.

(Dkt. #25-1 at 4–10.)

Based on these facts, and after summarizing the generally applicable law governing deliberate indifference claims, Defendants argue that the record establishes that Defendant Aucker was not personally involved in Plaintiff's medical treatment, and that there is no basis in this case for finding her liable in her supervisory capacity. (Dkt. #24 at 9–11.) Further, Defendants assert that the records establish that although Defendant Defoor saw Plaintiff just a few times during the relevant time period after his complaints of ear pain began, she "provided attentive medical treatment," and her treatment of Plaintiff did not amount to deliberate indifference despite his dissatisfaction. (Dkt. #24 at 11–13.)

Defendants also assert that the record disproves any claim that the alleged delay in care for Plaintiff's ear pain caused any substantial harm for which they are liable. (Dkt. #24 at 14.) First,

10

they say that any alleged delay is not the fault of Defendants where Plaintiff did not submit any sick call requests or complain to medical staff about ear pain for months at a time during the period in question. (*Id.*) They also say that Plaintiff refused to attend his ENT/otolaryngology appointment on April 14, 2022. (*Id.*) And finally, Defendants argue that although Plaintiff's "medical appointments in 2021 and 2022 were rescheduled due to unforeseen circumstances (e.g., lack of security escorts and inclement weather)," . . . that "delay in treatment cannot be attributed to the Defendants' conduct in this case." (*Id.* at 15.)

Moreover, according to Defendants, Plaintiff has not been diagnosed with any hearing loss that is directly attributable to any delay in providing care. (*Id.* at 14–15.) Rather, his records indicate possible non-organic hearing loss, with his audiogram having been determined to be unreliable. (*Id.* at 14.) And, according to the affidavit of Dr. Glenda Adams, any hearing loss Plaintiff might have sustained could be attributable to his chronic hepatitis B or congenital ear anomalies. (*Id.* at 14–15.)

Finally, Defendants assert that they are entitled to qualified immunity from Plaintiff's claims. (Dkt. #24 at 15–17.) They recount the general law governing the qualified immunity defense, then simply reiterate a summary of their previous arguments:

> Per the facts alleged in Williams' Original Complaint, Williams does not allege sufficient facts to show that Defendants were deliberately indifferent to his serious medical needs when his medical records showthat (1) RN Aucker had no personal involvement in the treatment of his complaints of ear pain, (2) the UTMB nurses supervised by RN Aucker, including RN DeFoor, provided competent and diligent nursing care, (3) RN DeFoor provided attentive medical treatment to address his complaints of ear pain and did not deny him treatment, ignore his complaints, or knowingly treat him incorrectly, and (4) any perceived interruptions or delays in his medical treatment for his complaints of ear pain were caused by his own actions, and when there is no summary judgment evidence showing that Defendants delayed his reception of medical care causing him substantial harm.

(*Id.* at 16–17.)

Defendants ask that the Court grant summary judgment in their favor and dismiss Plaintiff's claims with prejudice. (*Id.* at 17.)

### III. Legal Standards

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323–25). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961. If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585 (1986); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075.

When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at 961. However, the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as modified*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–51; *Texas Instruments*, 100 F.3d at 1179.

**IV. Discussion and Analysis**

   A. <u>Eleventh Amendment Immunity</u>

Defendants are correct that to the extent Plaintiff seeks money damages from them in their official capacities, those claims are barred by the Eleventh Amendment. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that state officials in their official capacities are not "persons" subject to suit under Section 1983); *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir.

2002) (explaining that "the Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity"). Plaintiff only seeks compensatory and punitive damages in this case. (Dkt. #1 at 4.) Accordingly, any claims against the Defendants in their official capacities must be dismissed.

### B. Deliberate Indifference

Deliberate indifference to an inmate's serious medical needs constitutes a violation of the Eighth and Fourteenth Amendments and thus states a cause of action under Section 1983. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 647 (5th Cir. 1996) (observing that "the Supreme Court has consistently adhered to a deliberate indifference standard in measuring convicted prisoners' Eighth Amendment rights to medical care and protection from harm"); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989) (applying Eighth Amendment standard in case brought by convicted prisoner). In *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), the Supreme Court explained that deliberate indifference involves more than mere negligence. The Court concluded that "a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Thus, the Eighth Amendment standard for deliberate indifference has both an objective and subjective prong. *Id.* at 839. Under the objective prong, the inmate "must first prove objective exposure to a substantial risk of serious harm." *Trevino v. Livingston*, No. 3:14-CV-52, 2017 WL 1013089, at *3 (S.D. Tex. Mar. 13, 2017) (citing *Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006)). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert*,

14

463 F.3d at 345 n.12.

To prove the subjective prong of the deliberate indifference test, the inmate "must establish that the defendants were aware of an excessive [or substantial] risk to the plaintiff's health or safety, and yet consciously disregarded the risk." *Cook v. Crow*, No. 1:20-CV-85, 2021 WL 6206795, at *3 (E.D. Tex. July 26, 2021) (citing *Farmer*, 511 U.S. at 397 and *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002)). The Fifth Circuit has discussed the high standard involved in demonstrating deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore, the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle* [*v. Gamble*], 429 U.S. [97,] at 107 [(1976)]. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

Plaintiff's deliberate indifference claim fails at both steps of this analysis. First, the summary judgment evidence cannot support any conclusion that Plaintiff's complaints about his ear constituted a serious medical need. Repeated examinations by multiple health care professionals over the course of many months revealed a mostly normal ear, with the most negative physical observation being "slight flaking" around an otherwise normal ear canal and ear drum. There was certainly nothing that had "crawled in" Plaintiff's ear, or holes in his ear, as he maintained, and no obvious sign of infection or other condition that required an urgent or heightened response. "[W]ith regard to the plaintiff's complaints regarding . . . ear pain, it has generally been concluded that these complaints, without more, do not constitute serious medical

15

needs which would support a finding of deliberate indifference." *Adams v. McCoy*, No. CIV.A. 11-0129-BAJ, 2012 WL 6694049, at *6 (M.D. La. Dec. 21, 2012) (citing *Martin v. Tyson*, 845 F.2d 1451 (7th Cir. 1988) (toothache and ear infection not sufficiently serious to constitute serious medical need)).

Second, there is no basis in this record on which to find that anyone was deliberately indifferent to Plaintiff's medical needs. He received multiple examinations, referrals and transportation to specialist appointments, multiple rounds of antibiotics, and multiple prescriptions for pain relief medication. While the record confirms some delays between Plaintiff's complaints and the care provided, brief delays in the provision of care alone do not amount to deliberate indifference. *Lewis v. Evans*, 440 F. App'x 263, 264 (5th Cir. 2011). This is especially true in the context of this case, involving a prison medical team's attempt to manage the medical needs of a segregated inmate who required a security escort at all times out of his cell, during a pandemic, with security staff shortages, and a winter storm, all of which no doubt combined to delay medical care for many people inside and outside of prison.

Moreover, inherent in a deliberate indifference claim is that there was something more that Defendants should have done to care for Plaintiff. This record refutes that finding, as the otolaryngology specialist ultimately prescribed the same pain relief medication that prison staff had already provided. Furthermore, the record establishes that Defendant Aucker had no personal involvement in Plaintiff's care (Dkt. #25-1 at 10 ("There is <u>no</u> medical record documentation that RN Auker has personally evaluated or treated Mr. Williams for his ear complaints.")), and she is entitled to judgment on that basis. *See Bell v. Livingston*, 356 F. App'x. 715, 716–17 (5th Cir. 2009) (recognizing that "[a] supervisor may not be held liable for a civil rights violation under any theory of *respondeat superior* or vicarious liability"). Defendant Ofili prescribed the antibiotic

16

amoxicillin to treat a presumed ear infection based on Plaintiff's complaints, which Dr. Adams testifies is a standard and appropriate treatment for ear infections. (Dkt. #25-1 at 10.) And Defendant Defoor lacked the authority to prescribe medication or do any more than she did, which was to refer Plaintiff to other medical providers. (Dkt. #25-1 at 10 ("[N]urses are trained to triage and assess patients but are not licensed to diagnose or prescribe.").) But even if Plaintiff *could* identify some additional care that these Defendants could and should have provided for his complaints, he would—at best—only have a claim for negligence, not a constitutional violation, as the Fifth Circuit has explained:

> Lewis has alleged no more than negligence and medical malpractice. Evans did not ignore Lewis's complaints. Rather, Evans examined Lewis several times in response to his complaints. Although Evans failed to diagnose Lewis's infected ear and folliculitis, "[i]t is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference." *Domino*, 239 F.3d at 756.

*Lewis*, 440 F. App'x at 265.

Finally, a "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). The summary judgment evidence refutes any claim that Plaintiff's alleged hearing loss constitutes harm arising from their deliberate indifference to his medical needs. Even assuming that Plaintiff has suffered a hearing loss, the evidence suggests that his hearing impairment is nonorganic, meaning that it is not the result of any detectable physical damage to his ear. Other possible causes of any hearing loss are his chronic hepatitis B or his TMJ dysfunction, either of which could cause hearing loss according to Dr. Adams. (Dkt. #25-1 at 13.) Plaintiff's self-serving speculation that a delay in treatment of some still-unknown ear condition caused his hearing loss is not sufficient to prove the substantial harm required to prevail in this case.

**V. Conclusion**

A review of summary judgment evidence in this case, viewed in the light most favorable to Plaintiff, shows that the evidence before the Court could not lead to different factual findings and conclusions. In other words, summary judgment for Defendants is appropriate.

Because Plaintiff cannot establish that either Defendant violated his constitutional rights, the Court has no need to address Defendants' claim of qualified immunity. *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007) ("Only after having found a constitutional violation may a court then consider whether the right in question was clearly established at the time of the violation such that a reasonable person would have known of it. Because we conclude that [plaintiff's] constitutional rights were not violated in this case, we have no call to reach the second part of the qualified immunity analysis." (Citation omitted)); *Wise v. Rupert*, No. CIV.A. 3:03-CV-293L, 2004 WL 2049311, at *3 (N.D. Tex. Sept. 14, 2004) ("A court need not undergo a qualified immunity analysis before addressing the merits of a claim when the evidence establishes that the movant is entitled to judgment as a matter of law on the merits. . . . In other words, if no constitutional violation is alleged or established, it is unnecessary to address the issue of qualified immunity.").

RECOMMENDATION

Accordingly, the undersigned recommends that Defendants' motion for summary judgment (Dkt. #24) be **GRANTED.**

Because Defendant Ofili, who has not been served with process in this case, is entitled to the same defenses presented in the pending motion, the Court should apply such defenses as if all non-moving defendants were parties to the motions. The Fifth Circuit has held that when a defending party establishes that the plaintiff has no cause of action, this defense also inures to the

benefit of non-answering defendants. *Wright v. Cerliano*, No. 6:19-CV-386, 2020 WL 2758789, at *2 (E.D. Tex. Apr. 20, 2020) (citing *Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001); *Young v. Isola*, 708 F. App'x 152 (5th Cir. 2017)), *report and recommendation adopted*, No. 6:19-CV-00386, 2020 WL 2754756 (E.D. Tex. May 27, 2020). "The policy rationale for this [result] is that it would be incongruous and unfair to allow some defendants to prevail, while not providing the same benefit to similarly situated defendants." *Spoon v. City of Galveston*, Tex., No. 3:17-CV-00120, 2018 WL 6246693, at *4 (S.D. Tex. Nov. 29, 2018). Accordingly, the summary judgment recommended herein should apply equally to Plaintiff's claims against Ofili. And because all other Defendants have already been dismissed, a judgment for all Defendants should enter.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

So ORDERED and SIGNED this 9th day of February, 2024.

_K. Nicole Mitchell_
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE